# 22-15293

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

≫≪

ALEXIS HUNLEY and MATTHEW SCOTT BRAUER, Individually
and On Behalf of All Others Similarly Situated,

*Plaintiffs-Appellants,*

*v.*

INSTAGRAM, LLC,

*Defendant-Appellee.*

_____

*Appeal From the United States District Court
for the Northern District of California
In In re Emulex Corporation Securities Litigation,
Case No.21-cv-03778-CRB, Judge The Honorable Charles R. Breyer*

**BRIEF FOR *AMICI CURIAE* GOOGLE LLC,
PINTEREST, INC., TWITTER, INC.,
AND THE WIKIMEDIA FOUNDATION, INC. IN SUPPORT
OF DEFENDANT-APPELLEE INSTAGRAM, LLC**

Rebecca Tushnet
LEX LUMINA PLLC
*Attorneys for* Amici Curiae
   *Google LLC, Pinterest, Inc.,
   Twitter, Inc., and The Wikimedia
   Foundation, Inc.*
745 Fifth Avenue, Suite 500
New York, New York 10151
646-898-2055
rtushnet@lex-lumina.com

## Disclosure Statement

Pursuant to FRAP 26.1, Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Pinterest, Inc. has no parent corporation and no publicly held corporation owns 10% or more of Pinterest's stock.

Twitter, Inc. is a publicly-traded company and has no parent corporation. No publicly-held corporation owns 10% or more of its stock.

The Wikimedia Foundation, Inc. is a non-profit organization with no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

# TABLE OF CONTENTS

**Page**

Disclosure Statement...................................................................i

Table of Contents ..................................................................... ii

Table of Authorities ................................................................iv

Interest of Amicus Curiae ........................................................1

Summary of Argument..............................................................2

Argument...................................................................................4

    I.   *Perfect 10* Remains Correct ...........................................4

        A.  The Technology Has Not Changed .......................................5

        B.  The Law Has Not Changed ...........................................10

            1.   The Statute Has Not Changed: It Focuses on the Entity that Engages in a Public Display ......................................10

            2.   Embedding is a Process of Creating a Link, Not a Process of Transmission ..................................................12

            3.   This Court Consistently Follows *Perfect 10*..................................15

            4.   The Supreme Court's Decision in *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), Reinforces the Importance of Controlling the Transmission of a Display ..................................................................16

        C.  Policy and Judicial Deference to Congress Support the Server Test..........................................................21

II.    Contrary District Court Cases Outside This Circuit Are
       Mistaken...................................................................................24

       A.   Public Display by Means of Transmission Is a Specific
            Act Engaged in by the Sending Server, Not by Other
            Computers ........................................................................24

       B.   Other Attempted Distinctions Also Fail...............................26

Conclusion .........................................................................................28

Certificate of Compliance .......................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Broad. Cos. v. Aereo, Inc.*,
573 U.S. 431 (2014)......................................................................*passim*

*APL Microscopic, LLC v. United States*,
144 Fed. Cl. 489 (2019) ...........................................................15

*Bell v. Wilmott Storage Servs.*,
LLC, 12 F. 4th 1065 (9th Cir. 2021)...................................14, 15, 25

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ..............................................23

*Goldman v. Breitbart News Network, LLC*,
2022 WL 298570 (N.D. Cal. Feb. 1, 2022) .........................................2

*Goldman v. Breitbart News Network, LLC*,
302 F. Supp. 3d 585, (S.D.N.Y. 2018) .............................3, 25, 26, 27

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
118 F.3d 199 (4th Cir. 1997) ...........................................25

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)...........................................................29

*Nicklen v. Sinclair Broadcast Group, Inc.*,
551 F.Supp.3d 188 (S.D.N.Y. 2021) ...................................24, 26, 27

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ....................................................*passim*

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ............................................15, 16, 18

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*,
907 F.Supp 1361 (N.D. Cal. 1995)......................................12

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) ............................................................3

*Society Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012)...............................................................15

*Sony Corp. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..........................................................................24

*VHT, Inc. v. Zillow Group, Inc.*,
  918 F.3d 723 (9th Cir. 2019) ........................................................5, 15

**Statutes**

U.S.C. § 101 ..............................................................................*passim*

17 U.S.C. § 106(A) ...........................................................................22

17 U.S.C. § 106(A)(c)(2) ..................................................................22

17 U.S.C. § 108.................................................................................27

17 U.S.C. § 512.................................................................................27

17 U.S.C. § 512(a) ...........................................................................27

17 U.S.C. § 512(b) ...........................................................................27

17 U.S.C. § 512(c) ............................................................................27

17 U.S.C. § 512(d) ...........................................................................27

Copyright Act of 1976 .......................................................................4

Copyright Alternative in Small-Claims Enforcement
  Act of 2020 ....................................................................................10

Further Consolidated Appropriations Act, 2020 Title X .........................10

Marrakesh Treaty Implementation Act (2018) ......................................10

Orrin G. Hatch–Bob Goodlatte Music Modernization Act (2018)...........10

Prioritizing Resource and Organization for Intellectual
  Property Act of 2008........................................................................10

Satellite Television Community Protection and Promotion
    Act of 2019 ............................................................................10

Satellite Television Extension and Localism Act of 2010......................................10

Satellite Television Extension and Localism Act
    Reauthorization Act of 2014............................................................10

Unlocking Consumer Choice and Wireless Competition Act (2014) .....................10

**Other Authorities**

Cathay Y. N. Smith, *Weaponizing Copyright*, 35 Harv. J.L.
    & Tech. 193 (2021)............................................................................21

Display Requirements: Tweets, Twitter Developer Platform,
    https://developer.twitter.com/en/developer-terms/display-
    requirements................................................................................22

H.R. Rep. No. 1476 (1971) .....................................................................20

Harsh Shah, *Introducing Better Previews of Your Content, Outside of
    Instagram*, Instagram (Dec. 17, 2021),
    https://about.instagram.com/blog/announcements/introducing
    better-previews-of-your-content-outside-of-instagram;....................................22

How to Disable Images in Firefox, https://www.tech-
    recipes.com/internet/browsers/mozilla-firefox/how-to-disable-
    images-in-firefox/ .........................................................................7

How to Disable Images in Google Chrome, WikiHow, May 30, 2022,
    https://www.wikihow.com/Disable-Images-in-Google-Chrome; .......................7

Image Blocker EX+ 9000,
    https://chrome.google.com/webstore/detail/image-blocker-ex%20-
    9000/eaabjlbddgjhjfplckkiglekpmonabcm?authuser=2......................................7

img src="https://[Server 2]/files/images/pinkrose.jpg"
    alt="Photograph of pink roses" width="455" height="298" ..............................6

Lynx, https://lynx.invisible-island.net/ ....................................................7

Michael Goodyear, *Embedding Permission Culture: A New Approach to the Server Test Quandary*, 75 Okla. L. Rev. __ (forthcoming 2022) ................................................................................................... 18

R. Anthony Reese, *The Public Display Right: The Copyright Act's Neglected Solution to the Controversy over RAM "Copies,"* 2001 U. Ill. L. Rev. 83, 149-50 (2001) ................................................................. 3

Restrict Embedding, YouTube Help, https://support.google.com/youtube/answer/6301625?hl=en (last visited Sept. 21, 2021) ................................................................... 22

*The State of Social Embeds* (2016), https://cdn.samdesk.io/static-content/The-State-of-Social-Embeds.pdf ........................................... 20

Synopsis, Protect Your Website From Its Embedded Content With iFrames, Jul. 25, 2013, https://www.synopsys.com/blogs/software-security/protect-your-website-with-iframes/ ...................................... 22

Tim Berners-Lee, *Links and Law*, https://www.w3.org/DesignIssues/LinkMyths.html (Apr. 1997) ...................... 21

URL for Website 1, www.website1.com ................................................................. 6

Zi Chu & Haining Wang, *An Investigation of Hotlinking and Its Countermeasures*, 34 Comput. Commn's 577, 581 (2011) ................................ 21

## Interest of Amicus Curiae

Google LLC ("Google") is a diversified technology company whose mission is to organize the world's information and make it universally accessible and useful.[1] Google offers a variety of products and services, including Google Search, Maps, Drive, and Gmail. Google's search offerings require Google to index billions of third-party sites, and it relies on settled precedent establishing that its practices are consistent with copyright law.

Pinterest is an online catalog of ideas. Every month, over 100 million people around the world use Pinterest to find and save ideas for cooking, parenting, style, and more.

Twitter, Inc. ("Twitter") is an international technology company that operates an online discussion platform. Twitter's mission is to serve the public conversation, and to provide a free and safe space for people to talk, share ideas and interact. Twitter offers products to facilitate that conversation, including ones that allow users to share and discuss a range of media. Numerous authors and artists share their creations on the platform, and many journalists and researchers use Twitter to gather and share information about world events. Twitter relies on

---

[1] No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was used to fund the preparation or submission of this brief; and no persons other than amicus curiae or its counsel contributed money that was intended to fund the preparation or submission of this brief. The parties have consented to the filing of the brief.

long-established copyright precedent to protect the rights of authors, and to ensure that it is operating in accordance with settled law.

Wikimedia Foundation (Wikimedia) is a non-profit organization that operates twelve free-knowledge projects on the Internet, including Wikipedia. Wikimedia's mission is to develop and maintain factual and educational content created and moderated by volunteer contributors, and to provide this content to people around the world free of charge. In August 2022, the Wikimedia projects received approximately 23 billion page views, including almost 9.9 billion page views on English Wikipedia. Since its creation, users have created over 54 million articles on Wikipedia. As part of its work, the Foundation allows users to submit a variety of appropriately licensed content as citations and illustrations in articles.

## Summary of Argument

This case presents a simple question: Who is engaging in the public display of an image embedded in a website? The answer, as this Court has correctly recognized, is the entity whose server transmits the image to a user whose web browser has requested it. Hunley may or may not be right that viewers of Instagram images embedded in third-party websites "do not know or care that the photo or video is located on the Instagram server," 2022 WL 298570, at *2 (N.D.

2

Cal. Feb. 1, 2022),[2] but the law of this Circuit does care, and for good reason: Congress has prescribed limits on the scope of the public display right, and respecting those limits in the online environment requires attention to technical reality. Nothing about that reality or the scope of the statutory public display right has changed since this Court decided *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).

Copyright "is a creature of statute, and the only rights that exist under copyright law are those granted by statute." *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005) (en banc). Blurring or misdrawing the boundaries of those rights can disrupt the balance Congress has carefully struck between the incentives of copyright owners and the legitimate interests of audiences and other participants in the marketplace of ideas.[3] It is particularly important to avoid

---

[2] *But see Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 586 (S.D.N.Y. 2018). ("[M]any websites embed Twitter posts into their own content; for those familiar with digital news or other content, this is common knowledge.").
[3] As Professor Reese presciently wrote:

> [I]nsisting that the specific rights implicated by a particular activity (such as transmitting images over the World Wide Web) be properly identified emphasizes that copyright owners do not simply "own" their "works" but, rather, they have exclusive control over certain specified uses of those works, while other uses—for example, reading or viewing a copy of a work, privately performing a work, or using a work's uncopyrightable elements—are not under the copyright owner's control. ….
> Copyright has never given owners complete control over their works, but instead has sought to give owners sufficient control to provide incentives to produce and disseminate copyrightable works while allowing the public to benefit from access to those works.

overreaching here, where the embedded image is not alleged to be infringing at its source: the copyright owner placed it online for anyone to see in the exact location where the person embedding the image directed the end user to find it.

Rejecting *Perfect 10* would profoundly distort copyright law and make millions of website operators into infringers. It would allow copyright owners to prohibit third parties from pointing audiences to a work that is already publicly displayed with the authorization of the copyright owner, merely because the copyright owner may not like the way the audience is being led to the work. Because the Copyright Act does not provide such an excessive level of control, the district court's opinion should be affirmed.

## Argument

I.   *Perfect 10* Remains Correct.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), correctly held that the entity that "publicly displays" an image within the meaning of the Copyright Act is the entity that controls the means by which a particular copy of that image is shown to the public. Where the public display of an image occurs online, by means of a digital transmission, the entity responsible for the display of

---

R. Anthony Reese, *The Public Display Right: The Copyright Act's Neglected Solution to the Controversy over RAM "Copies,"* 2001 U. Ill. L. Rev. 83, 149-50 (2001).

that image is the one that controls the server that transmits the display. This holding is known as the "server test."

### A. The Technology Has Not Changed.

This Court described the relevant technology fifteen years ago:

> Instead of communicating a copy of the image, [someone embedding an image] provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause … images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the … image. It is this interaction that causes an … image to appear on the user's computer screen.

*Id.* at 1161.[4]

This process, known as embedding or inline linking, allows a user's browser to integrate content from multiple sources within one browser window. Nothing relevant about HTML or its operation has changed in the years since this court decided *Perfect 10*. Embedding now often involves popular social media sites that were founded after *Perfect 10* was decided. But that is a distinction without a

---

[4] Where the server operator is authorized to display the image publicly, there is no infringement; where they are not, the server operator is directly infringing, and the entity that embedded the image may or may not be secondarily liable, depending on whether the requirements for secondary liability are satisfied. *See VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (setting out standards for contributory liability).

difference. Social media sites also operate servers; people who embed images still use standard HTML instructions; and users' browsers still perform the same steps in retrieving embedded images from host servers. The computer that engages in the public display is still the computer that transmits the image, not the computer that merely provides a user's browser with the HTML instructions specifying where to find that image.

To understand more clearly how embedding works, consider a user who wants to view a website ("Website 1"). Website 1 contains both native content stored on its own server ("Server 1") and instructions to embed content from an entirely different website ("Website 2"), whose content is stored on its own server ("Server 2"). For content from Website 2—for example, an image of some pink roses stored in the JPG file format ("pinkrose.jpg")—the author of Website 1 needs to give the user's computer directions on how to find and retrieve pinkrose.jpg from Server 2. To do that, the author of Webpage 1 uses the following HTML code to communicate those directions to the web browser on the user's computer:

```
<img src="https://[Server 2]/files/images/pinkrose.jpg"
alt="Photograph of pink roses" width="455" height="298">
```

The user seeking to access and view Website 1 types the URL for Website 1 (e.g., www.website1.com) into their web browser's address bar. The user's web browser then queries Server 1 for the HTML code of Website 1. The browser software processes the HTML code for Website 1 and renders on the user's screen

6

both the native content for Website 1 and, following the embed instructions encoded in Website 1's HTML, asks Server 2 for the image of pinkrose.jpg, which is hosted on Server 2 and transmitted from that location directly to the user's browser. This explanation assumes that the user's browser is configured to display images in the first place. It is simple to browse online with images turned off, which many users do for reasons of privacy, security, or bandwidth constraints.[5]

---

[5] See, e.g., How to Disable Images in Google Chrome, WikiHow, May 30, 2022, https://www.wikihow.com/Disable-Images-in-Google-Chrome; Image Blocker EX+ 9000, https://chrome.google.com/webstore/detail/image-blocker-ex%20-9000/eaabjlbddgjhjfplckkiglekpmonabcm?authuser=2 (allowing Chrome users to choose which images to load, including blocking images from third-party servers); Lynx, https://lynx.invisible-island.net/ (text-only browser); How to Disable Images in Firefox, https://www.tech-recipes.com/internet/browsers/mozilla-firefox/how-to-disable-images-in-firefox/ (explaining that users of Firefox can choose among displaying all images, displaying no images, or blocking only images that originate from third-party servers).



The embedded image seems to appear "on" Website 1, but it is not actually inserted into the native content there or copied onto Server 1. Importantly, if the operator of Website 2 removes the image from Server 2 or changes its location, the user will not see the now-missing image of pink roses, even though the user's browser processes the same HTML code for Website 1 and is able to render all of its native content. Instead, they might see one of several common icons indicating that the image specified in the embed code cannot be found on Server 2 and thus cannot be rendered in the browser:

   

In addition, Server 2 can be configured in many cases to refuse requests that come from Website 1, or requests made by users using a particular browser, or requests from users from a particular range of IP addresses, or requests not made by an approved list of "referrers."[6] Website 1 has no control over whether Server 2 sends pinkrose.jpg to the user's browser. Server 2 also controls whether pinkrose.jpg really is a picture of roses, or, at its option, a picture of a skunk. Server 2 possesses the copy of that image file and decides both what it is and to whom to transmit it. These facts reinforce the difference between the HTML instructions of Website 1 and the actual display of pinkrose.jpg, which is entirely under the control of Server 2 and the user.

The technology still operates exactly as *Perfect 10* described it. As this Court understood, embedding is a kind of linking, not distinguishable in such cases from other types of linking. Whether there is any display at all is under the control

---

[6] Web servers (like Server 2) log certain information about the requests they process for assets like images and HTML code, including the "referrer," which is the URL for the page that contained the link on which the user clicked, or the URL for the embedding page (like Website 1) in the case of an inline link like an embedded image. It is easy to configure a web server to refuse to provide images to referrers outside one's domain, effectively stopping embedding.

of the user (who decides whether to turn images on or off) and Server 2 (which decides whether to honor referral requests).

B. The Law Has Not Changed.

1. The Statute Has Not Changed: It Focuses on the Entity that Engages in a Public Display.

The definition of "display" is the same now as it was when the Copyright Act was enacted in 1976.[7] To "display" a work means "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." 17 U.S.C. §101. The definition limits what it means to "show a copy of [an image]" other than "directly"; it requires a "device or process" of some kind but avoids any implication that the device or process in question can be controlled by anyone other than the person whose copy of the image is being shown. Online, the person displaying an image indirectly by means of a "device or process" is the one who controls the server that hosts the copy of the image.

---

[7] Congress has not revisited the definition of "display" or "display publicly" despite revising the copyright statute (and other intellectual property statutes) multiple times since *Perfect 10*. For copyright, those changes are: The Prioritizing Resource and Organization for Intellectual Property Act of 2008; The Satellite Television Extension and Localism Act of 2010; The Unlocking Consumer Choice and Wireless Competition Act (2014) (specifically overturning Copyright Office rulemaking); The STELA Reauthorization Act of 2014; Marrakesh Treaty Implementation Act (2018); Orrin G. Hatch–Bob Goodlatte Music Modernization Act (2018); Satellite Television Community Protection and Promotion Act of 2019, Title X of the Further Consolidated Appropriations Act, 2020; Copyright Alternative in Small-Claims Enforcement Act of 2020.

At the most basic level, one who leads someone else to see an existing public display of a work is not themselves publicly displaying that work. If it were otherwise, tour guides would be infringing when they lead their charges to see specific copyrighted works in a museum. The HTML source code of a website that contains instructions specifying where to find an embedded image functions like a tour guide: It offers directions to locate a copy of a work that is already being publicly displayed by a third party. Online, if the work is still on display when the user's browser attempts to retrieve it, the user will see it. If the display of the work is gone or the host server refuses requests from outside referrers, however, there will be nothing to see—circumstances the person embedding the work cannot control.

Tour guides are not engaging in an infringing public display because the museum, not the tour guide, is responsible for the work's public accessibility. Similarly, if a homeowner hangs their beautiful painting near their undraped window, and their neighbor removes part of her own fence to see the painting through the window, the neighbor is not engaging in an infringing public display, because the painting's owner is still responsible for the work's accessibility and can close their drapes at any time. Nor does a real estate developer engage in public display by building a house with a balcony that overlooks a publicly visible sculpture garden nearby. The garden owner has made the public display; the

builder has merely changed the number of people who can see it and the location from which it can be seen.

>    2.   Embedding is a Process of Creating a Link, Not a Process of Transmission.

The "transmit clause" in Section 101's definition of "display publicly" does not change the basic distinction between leading someone to an existing public display and actually displaying a work publicly oneself: The entity that transmits an online display is the host server.[8]

The definition of "display … publicly" in Section 101 contemplates two different means of displaying a work "publicly." A public display can occur in person, when a copy of the work is shown to members of the public gathered together in a public or semi-public place where the work itself is also located. See 17 U.S.C. 101. It can also occur remotely, by transmission. *See id.* Given the technical architecture of the Internet, the public display of copyrighted work online necessarily occurs by means of a transmission.

---

[8] As a foundational case concluded, with respect to works that were available online *without* the copyright owner's authorization, "it does not make sense to hold the operator of each computer liable as an infringer merely because his or her computer is linked to a computer with an infringing file…. Finding such a service liable would involve an unreasonably broad construction of public distribution and display rights. No purpose would be served by holding liable those who have no ability to control the information to which their subscribers have access, even though they might be in some sense helping to achieve the Internet's automatic 'public distribution' and the users' 'public' display of files." *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F.Supp 1361, 1365 (N.D. Cal. 1995).

By the statute's terms, "to 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. §101. A person publicly displaying an image by transmission must therefore "sen[d]" the image "from" one "place" to another.[9] However, a person who embeds an image from a third-party website does not and cannot "send" or "communicate" that image, because they lack any control over it. Instead, they must rely on the server hosting the image to do the sending. The server hosting the image is thus the "place" from which the image is "sent." The website embedding the image is not that "place." The transmission process contemplated in Section 101's definition of a remote public display is carried out in the online environment by the host server.

Regardless of what an individual user might believe about the source of an image, then, the statute focuses on the entity that actually controls the public display (i.e., the copy of the image being shown to the public present at—or being transmitted to a remote public from—a given location at a particular point in time). This rule is consistent with copyright's general principles of strict liability: A person who mistakenly believes that a use is noninfringing can still be liable, while a person who mistakenly believes that they are engaging in infringement is not an

---

[9] Congressional drafting focused entirely on limiting the right of an *owner of a copy* to engage in a public transmission, not on third-party access to authorized public displays. Reese, *supra*, at 94-97 (setting out the relevant legislative history).

infringer. Whether a user believes that a particular website copied a work or publicly displayed a work is likewise unimportant to the statute.

*Perfect 10* thus reached the only result consistent with the statutory text. The source of the public display is the entity that controls the availability of the image at a given location online and responds to HTML requests from potential remote viewers by transmitting the display of the image to them. The user's web browser then causes the image to appear on the user's computer screen. Where the image in question is lawfully available at its source, the person who wrote the HTML instructions has not engaged in any copyright-relevant act.[10]

The resulting rule is simple. To "display," one must possess a copy and have control over whether the display (i.e., the showing of that copy) takes place; to display "publicly" via transmission, one must have control over whether the transmission of the display takes place. The controlling entity is the one in control of the server that hosts and transmits the image.

---

[10] In cases where an embedded image was uploaded without authorization, the primary wrongdoer is the uploader—and, because the uploader is in control of whether the image is publicly displayed, ending their wrongful conduct solves the problem, since the embedder never engaged in a display of its own. By contrast, if an embedding page or search engine index disappears, an infringing copy still remains publicly displayed as long as it exists on the source server. *See Bell*, 12 F.4th at 1073 ("By displaying the … photo on a server that was publicly accessible to anyone with an Internet connection, however, [the server owner] publicly displayed the photo, … regardless of whether or not any particular person actually found and viewed it.").

3.        This Court Consistently Follows *Perfect 10*.

This Court has applied *Perfect 10*'s server test in various online situations. *See, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 668 (9th Cir. 2017); *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 736 (9th Cir. 2019). For example, this Court recently specifically reaffirmed that the hosting server is the source of transmissions, no matter how an individual viewer comes to see the transmitted image. *Bell v. Wilmott Storage Servs.*, LLC, 12 F. 4th 1065, 1081-82 (9th Cir. 2021) (defendant's website "included the data then stored on the website's servers"; its actions "assuming responsibility for and maintaining the server are clearly 'the most important cause[s]' of the public display of the … photo") (citing *Giganews*, 847 F.3d at 666).[11]

In *Giganews*, this Court held that the plaintiff could not state a claim of direct infringement against Giganews based on the operation of its Mimo reader because use of the reader to call up infringing images was not volitional conduct by Giganews. *Giganews*, 847 F.3d at 668. This followed from standard principles of proximate causation. *Id.* at 666. The court explained that "Mimo is just a reader,

---

[11] Other courts agree. *See, e.g.*, *Society Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (holding archbishop liable for public display because infringing work was "loaded on the Archbishop's computer server and posted to his Website.") (citing, inter alia, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007))); *APL Microscopic, LLC v. United States*, 144 Fed. Cl. 489, 499 (2019) (same result).

a piece of software that allows a user to view an image" that is stored and communicated from elsewhere. *Id.* at 668. The server hosting the infringing image was responsible for the infringing display.

In *Zillow*, likewise, this Court relied on *Perfect 10* to reject a theory that would have imposed liability on a website for making works "available for public display" but not actually transmitting any displays of those works to users. *Zillow*, 918 F.3d at 736. *Zillow* found this theory "neither supported by the statute nor embraced by this court." *Id.* (citing *Perfect 10*, 508 F.3d at 1160 (9th Cir. 2007).

> 4. The Supreme Court's Decision in *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), Reinforces the Importance of Controlling the Transmission of a Display.

*Aereo* does not counsel a change in this Circuit's law, both because the Court limited its decision to the facts before it, 573 U.S. at 449, and because the case involved public performance rather than public display, *id.* at 447-48. Nevertheless, this case, like *Aereo*, requires application of the "transmit clause" from the statutory definition of "public" display or performance. 17 U.S.C. §101. Congress introduced the transmit clause into the Copyright Act of 1976 for the express purpose of capturing for copyright owners the value of cable retransmissions of broadcast television programs to geographic areas beyond the reach of the broadcasters' own limited signal range. *See Aereo*, 573 U.S. at 441

16

("Congress also enacted the Transmit Clause, which specifies that an entity performs publicly when it 'transmit[s] . . . a performance . . . to the public.'").

Aereo designed a system to receive TV signals broadcast over the air and retransmit those signals over the Internet to subscribing computer users through servers, antennae, and other equipment that Aereo owned and controlled. *Id.* at 436-37. Aereo argued that its server-attached antennae were no different than the rooftop antennae that TV owners had been using in their own homes for decades to get better reception of over-the-air programming. *See* Brief of Respondent at 27-28. The Court disagreed. *See Aereo*, 573 U.S. at 442. It held that Aereo acted like a cable company and infringed ABC's public performance rights by initiating unauthorized Internet retransmissions of ABC's over-the-air TV program signals. According to the Supreme Court, Aereo engaged in public performance because "Aereo's activities are substantially similar to those of the [cable] companies that Congress amended the Act to reach." *Id.* Aereo, that is, used its own system to retransmit broadcasters' signals, and the Copyright Act's cable provisions were deliberately crafted to reach entities that owned and controlled the means of retransmission.

Because the Court decided *Aereo* based on the cable analogy, it left intact other basic copyright principles of causation. It explicitly did not decide that having any causal relationship at all to a transmission made an entity into a

transmitter. *See, e.g.*, *Aereo*, 573 U.S. at 438-39 (distinguishing liability for systems that work like cable in transmitting works and those who "merely suppl[y] equipment that allows others" to transmit); *Giganews*, 847 F.3d at 666 (concluding that causation and volitional conduct requirements survive *Aereo*); *cf.* Michael Goodyear, *Embedding Permission Culture: A New Approach to the Server Test Quandary*, 75 Okla. L. Rev. __, at *25 (forthcoming 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4042401 (noting that "the distinction between user and embedder hews closely to looking at volitional conduct").

Indeed, the Court emphasized that the cable analogy made its holding quite "limited" and not extensible to other technologies. *Aereo*, 573 U.S. at 449 ("Congress, while intending the Transmit Clause to apply broadly to cable companies and their equivalents, did not intend to discourage or to control the emergence or use of different kinds of technologies. But we do not believe that our limited holding today will have that effect.").

By initiating unauthorized retransmissions of ABC's broadcast program signals, Aereo put itself in a position analogous to that of the host computer serving the unauthorized images in *Perfect 10*. Embedding is very different from retransmission: Because the request for an image is sent to a third-party server, the person embedding the image merely instructs the user's computer how to receive

18

the transmission of an existing display. The person embedding the image does not transmit or retransmit the display of the image at all. At no time does the display of the image travel through the equipment or network of the person who embedded it, as transmissions did in *Aereo*. Moreover, a person who embeds an image on their website is entirely dependent on third parties: the person who posted the content (who can remove or move it at any time); the person whose computer requests to see the content; and the internet service provider carrying the transmission from the poster's server to the viewer's browser.

The Supreme Court proceeded from the premise that Aereo was transmitting a performance; it disagreed with the Second Circuit only about whether the transmission was "public" or "private." *Aereo*, 573 U.S at 438. The issue here, by contrast, is not publicness (or performance), but "transmission" itself. A person embedding an image, unlike Aereo, possesses no relevant equipment that emulates the retransmission functions of a cable system, which was the key reason that the Court found Aereo to be engaged in public performance. *Id.* at 439-40 (emphasizing the importance of owning antennas and cables through which performances flowed), 442 (emphasizing the relevance of retransmission and making viewers' receipt of performances physically possible).

That is, because of the cable provisions of the Copyright Act, cable equipment providers can be public performers. But embedders are not equipment

19

providers. *See id.* at 442-43 ("By means of its technology (*antennas, transcoders, and servers*), Aereo's system receives programs that have been released to the public and *carries* them by private channels to additional viewers. It *carries* whatever programs it receives ….") (emphasis added) (cleaned up). Indeed, every non-cable system mentioned in the legislative history carried the content and had control of the transmission device. H.R. Rep. No. 1476, at 111 (1971) ("[O]ther forms of secondary transmission [beyond cable] are also considered, including apartment house and hotel systems, wired instructional systems, and common carriers.").

*Aereo*'s reliance on the cable analogy and its focus on public performance also reinforces the importance of the server test for the public display right: The public performance right by its terms involves a "performance" of a work, 17 U.S.C. §101, without necessarily requiring a copy; however, the public display right by its terms requires "show[ing] a copy," *id. See Aereo*, 573 U.S. at 447-48 (focusing on the meaning of transmitting a "performance," rather than a "copy," because of the language of the public performance right). With the public display right, there can be no display without a copy. The source server is in control of the copy, no matter who else is in the causal chain that leads to a given display of that copy to a given viewer.

C. Policy and Judicial Deference to Congress Support the Server Test.

Rewriting the Copyright Act to allow copyright owners to control who can see lawfully publicly displayed copies of their works would attack the very structure of the internet. *See* Tim Berners-Lee, *Links and Law*, https://www.w3.org/DesignIssues/LinkMyths.html (Apr. 1997). General-purpose search engines, news publishers, and ordinary users rely on linking and embedding. One study estimated that nearly ninety-nine percent of blogs use embedding. Zi Chu & Haining Wang, *An Investigation of Hotlinking and Its Countermeasures*, 34 Comput. Commn's 577, 581 (2011), and another found that nearly a quarter of all news articles used at least one embed. *The State of Social Embeds*, Samdesk.io (2016), https://cdn.samdesk.io/static-content/The-State-of-Social-Embeds.pdf. *Perfect 10*'s rule ensures that only devices or processes that participate directly in transmission, such as a sending computer that hosts an image, engage in public display.

This Court should not endorse an interpretation of the law that makes lawbreakers out of millions of ordinary citizens, risking unpredictable and censorious liability. *See, e.g.*, Cathay Y. N. Smith, *Weaponizing Copyright*, 35 Harv. J.L. & Tech. 193 (2021) (discussing abusive copyright claims made for political or rent-extractive purposes). Direct copyright infringement is a strict

liability offense that exposes even unwitting infringers to statutory damages of up to $30,000 per work.

When copyright owners choose to make their images freely viewable online, they have authorized the public display of those images. Copyright owners are free to use services that create technical barriers to embedding, such as password protection or automatic measures that accept transmission requests from only approved referrers.[12] But copyright law is not an appropriate mechanism for ensuring that an artist's work appears only in a *context* of which they approve. Where Congress wanted to enact such moral-rights-type protection, it has done so explicitly—and explicitly limited such rights to single- or limited-edition works, not works that are distributed online. *See* 17 U.S.C. § 106(A) (Visual Artists Rights Act, VARA).

---

[12] For example, YouTube, Instagram, and Twitter, all allow control over how a work may be embedded, and other websites can be configured to restrict embedding of content they host. *See, e.g.*, Restrict Embedding, YouTube Help, https://support.google.com/youtube/answer/6301625?hl=en (last visited Sept. 21, 2021); Harsh Shah, Introducing Better Previews of Your Content, Outside of Instagram, Instagram (Dec. 17, 2021), https://about.instagram.com/blog/announcements/introducingbetter-previews-of-your-content-outside-of-instagram; Display Requirements: Tweets, Twitter Developer Platform, https://developer.twitter.com/en/developer-terms/display-requirements (requirements include displaying the Tweet author's profile picture, @username, and display name, as well as linking to the author's Twitter profile); *see generally* Synopsis, Protect Your Website From Its Embedded Content With iFrames, Jul. 25, 2013, https://www.synopsys.com/blogs/software-security/protect-your-website-with-iframes/.

Even where Congress has created moral rights protection for some types of visual works, it has declined to go as far as allowing artists to control the context in which their works are displayed. So, VARA's moral right of integrity does not allow an artist to control the "*public presentation*, including lighting and *placement*, of the work" (emphasis added). *Id.* § 106(A)(c)(2). Given that Congress declined to give such control even to the subset of works meriting moral rights protection, an interpretation of the public display right that would go far beyond VARA for works online is unwarranted.

Where copyright owners are seeking to legitimately enforce the limited public display right Congress gave them, they have access to remedies. In cases where embedded images are infringing at their source, the infringing copies can be targeted with takedown notices or lawsuits. Moreover, where a person embedding third-party content had or obtains knowledge that an embedded work is infringing, they may be secondarily liable because they may be materially contributing to the infringement. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."). Given the ability to pursue the direct infringer and the prospect of secondary liability, there is no need to strain the definition of public display to combat online infringement. *Perfect 10*, 508 F.3d at 1172.

In *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), the Supreme Court cautioned against distorting statutory text in response to the demands of copyright owners for greater control of new technologies:

> The judiciary's reluctance to expand the protections afforded by [] copyright without explicit legislative guidance is a recurring theme. … Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.

*Id.* at 431. This guidance is even more compelling where, as here, the technology is not new.

## II. Contrary District Court Cases Outside This Circuit Are Mistaken.

### A. Public Display by Means of Transmission Is a Specific Act Engaged in by the Sending Server, Not by Other Computers.

Some district courts in the Second Circuit have rejected *Perfect 10* based on a mistaken analysis of the public display right that asks only whether an entity was a contributing cause of at least some viewers' experience of a public display, rather than focusing on who engaged in the public display of the work at issue. *See Nicklen v. Sinclair Broadcast Group, Inc.*, 551 F.Supp.3d 188, 195 (S.D.N.Y. 2021) (holding that the display right "is concerned not with how a work is shown, but that a work *is shown*"; failing to ask who is doing the showing) (emphasis

24

added); *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 592 (S.D.N.Y. 2018).

Those decisions rely on the idea that the public display right is distinct from the reproduction right, but they mistake the significance of that fact. They wrongly conflate *possessing* a copy of a work with *making* a copy, then jump to the conclusion that the public display right must extend beyond copyists in order to be distinguished from the reproduction right. But this maneuver is unnecessary and illogical. The public display right makes public display of an infringing copy unlawful even if the displaying party didn't make the infringing copy. That rule gives the public display right independent force while not implicating embedding in any way. *Bell*, 12 F. 4th at 1081-82.

*Perfect 10*'s server test asks who is in control of the copy that is being shown to the public via online transmission. Control over a copy—possession—is not the equivalent of reproduction. For example, if one possesses an unauthorized copy of a work and elects to display the work publicly by showing that infringing copy, one may violate the public display right without having also violated the reproduction right. *See Bell*, 12 F. 4th at 1073 (entity that bought a server containing infringing image, and thus made no infringing reproduction, violated the public display right); *cf. Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997) (owner of infringing copy could violate

distribution right independent of reproduction right). The existence of the reproduction right is irrelevant to whether an entity having no copy of its own exercises the public display right by providing HTML that leads a user's computer to contact a host server, triggering the host server to transmit an existing online display to that user.[13]

Where an image is lawfully displayed on a website open to the public, the website owner is exercising the public display right. The copyright owner does not have the additional right under copyright law to decide who may see that public display, or what path they may take to do so. The key question for direct liability is: Who made it possible—not more likely, but actually possible in the first place—for the public to see the display via online transmission? The answer is the entity that controls the server hosting the copy of the image at issue.

### B. Other Attempted Distinctions Also Fail.

*Nicklen* and *Goldman* introduce another concept foreign to the public display right—that it matters whether the embedding entity is a search engine.

---

[13] If the possessor of a copy does not enable its transmission by, for example, hosting it on a publicly available server, then it is possible that another entity could be the one "transmitting" the display. So, if a museum patron livestreams her visit, controlling the device that initiates the display, she can "transmit" a display of an artwork. But such a conclusion would be inappropriate in the case of embedding, where the possessor of the copy also transmits the display. Most actual online cases involve parties who both host copies and transmit them, because hosting and serving are technologically linked. Regardless, the entity that controls whether a display can be accessed via transmission is the transmitter.

*Nicklen*, 551 F.Supp.3d at 195; *Goldman*, 302 F.Supp.3d at 595-96. Copyright law does take into account an entity's status in certain circumstances. *See, e.g.*, 17 U.S.C. §108 (special exceptions for libraries and archives); §§ 512(c) & (d) (safe harbors for content hosting providers and search engines). But the public display right, unlike Section 512, does not distinguish among entities that engage in a public display.[14] If an interpretation of "public display" requires inventing an exception with no statutory basis in order to avoid massive disruptions to ordinary, beneficial activities, that is good evidence that the interpretation itself is wrongheaded.

These cases also rely on the idea that an embedding site is the one engaged in the public display because the user's computer receives the image automatically after requesting the page in which the image is embedded. *See, e.g.*, *Goldman*, 302 F.Supp.3d at 594. But that is simply not so: Because the embedding site never hosts the image, the user's computer receives an image only if the server hosting the third-party site responds to the user's request by transmitting the image. As explained above, that happens only if the third-party site still hosts the image and is

---

[14] Section 512 creates safe harbors for certain types of online service providers based on the functions they perform in relation to digital copyrighted content: routing, caching, hosting, or providing information location tools (i.e., a search engine). *See* 17 U.S.C. 512(a)-(d).

configured to send it in response to requests like those made by the user's

computer—and only if the user's browser is configured to receive it.

## Conclusion

This case raises the same issue that was raised and correctly decided in

*Perfect 10*: whether an image embedded in a website via HTML code is publicly

displayed by the website that hosts the relevant copy of that image or by the

website that merely provides HTML code containing the address of the image.

That issue was, and still is, definitively answered by *Perfect 10*'s server test.

The server test is the only coherent application of the relevant provisions of

the Copyright Act to the technology of HTML embedding. Those statutory

provisions have not changed since *Perfect 10* was decided, and no intervening

Supreme Court decision alters this court's previous interpretation and application

of those provisions. Notably, the Supreme Court's decision in *Aereo* is fully

harmonized with the server test.

Some district courts in other circuits have either misconstrued the relevant

statutory provisions or failed to appreciate the logical legal consequences of the

relevant technological facts. HTML has enabled the embedding of images since the

earliest days of the Web, and it makes no difference what types of websites,

whether search engines or popular social media platforms, give and receive HTML

instructions. This Court should not destabilize the law and threaten millions of

ordinary users with strict liability and statutory damages for pointing other people to works that are already being lawfully publicly displayed. "[A] copyright law that can work in practice only if unenforced is not a sound copyright law. It is a law that would create uncertainty, would bring about selective enforcement, and, if widely unenforced, would breed disrespect for copyright law itself." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 545 (2013). The district court's judgment should be affirmed.

Dated: October 10, 2022

Respectfully submitted,

By: \s\ Rebecca Tushnet
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 10151
(646) 898-2055
rtushnet@lex-lumina.com

*Attorneys for Amici Curiae Google LLC, Pinterest, Inc., Twitter, Inc., and The Wikimedia Foundation, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-15293

I am the attorney or self-represented party.

**This brief contains** | 6,583 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
   29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
   *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;

   ○ a party or parties are filing a single brief in response to multiple briefs; or

   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Rebecca Tushnet | **Date** | Oct 11, 2022

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/2018*